905 F.2d 719
 108 A.L.R.Fed. 159, 58 USLW 2732
 SATURN DISTRIBUTION CORPORATION, a Delaware Corporation,
Plaintiff-Appellant,
v.
Donald E. WILLIAMS, Commissioner of the Department of Motor
Vehicles, Commonwealth of Virginia; Virginia
Automobile Dealers Association,
Defendants-Appellees,
Center for Public Resources, Inc., Amicus Curiae.
 No. 89-2773.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 6, 1989.
Decided June 6, 1990.
Rehearing and Rehearing In Banc Denied July 20, 1990.
 
 Kenneth Steven Geller, Mayer, Brown & Platt, Washington, D.C. (Richard J. Favretto, Evan M. Tager, Mayer, Brown & Platt, Washington, D.C., Stephen M. Shapiro, Mayer, Brown & Platt, Chicago, Ill., E. Milton Farley, III, David F. Peters, Hunton & Williams, Richmond, Va., Roderick D. Gillum, Vice President and General Counsel, Saturn Corp., Troy, Mich., on brief), for plaintiff-appellant.
 Guy Winston Horsley, Jr., Sr. Asst. Atty. Gen., Robert Harvey Chappell, Jr., Christian, Barton, Epps, Brent & Chappell (Mary Sue Terry, Atty. Gen., Walter A. McFarlane, Deputy Atty. Gen., Jeffrey A. Spencer, Eric K.G. Fiske, Asst. Attys. Gen., E. Ford Stephens, Christian, Barton, Epps, Brent & Chappell, William T. Lehner, Malvin W. Brubaker, Richmond, Va., on brief), for defendants-appellees.
 John A.C. Keith, Blankenship & Keith, Fairfax, Va., for amicus curiae.
 Before WIDENER, CHAPMAN, and WILKINSON, Circuit Judges.
 CHAPMAN, Circuit Judge:
 
 
 1
 Plaintiff/appellant Saturn Distribution Corporation appeals the denial of its motion for summary judgment and the grant of summary judgment against it by the district court. Saturn brought this action for declaratory and injunctive relief against the Commissioner of the Virginia Department of Motor Vehicles to challenge two provisions of the Virginia Motor Vehicle Dealer Licensing Act. The central question raised below and on appeal is whether Virginia may prohibit the formation of a nonnegotiable agreement between an automobile dealership and an automobile manufacturer compelling arbitration of claims arising out of the dealership agreement. The district court held that Virginia may enforce its statutory provisions designed to prevent the formation of mandatory arbitration agreements between automobile manufacturers and dealers. We hold that one of the challenged provisions is preempted by the Federal Arbitration Act, and therefore reverse.
 
 I.
 
 2
 Saturn Distribution Corporation (Saturn) is a wholly-owned subsidiary of Saturn Corporation, which is in turn a wholly-owned subsidiary of General Motors Corporation. Saturn was created in 1985 to design, manufacture, and market motor vehicles under the "Saturn" nameplate. Saturn adopted a "Mission and Philosophy" of manufacturing and marketing cars, which is reflected in the Saturn Distribution Corporation Dealer Agreement (hereinafter "Dealer Agreement"). As part of that philosophy, Saturn concluded that an alternative dispute resolution system should be a core element of its Dealer Agreement. That system includes binding arbitration which is mandatory under the Agreement.[1]
 
 
 3
 The Commonwealth of Virginia has enacted legislation that prohibits automobile manufacturers and dealers from entering into agreements that contain mandatory alternative dispute resolution provisions, such as Saturn's. Va.Code Ann. Sec. 46.1-550.5:27 (1989 Supp.). In addition, a second statute requires a manufacturer to submit its standard franchise agreement to the Commissioner of the Department of Motor Vehicles for his approval prior to offering it to a dealer. Va.Code Ann. Sec. 46.1-550.5:24 (1988 Supp.). When Saturn submitted its Dealer Agreement to the Commissioner, Donald E. Williams, he refused to approve it. The Commissioner subsequently made clear that he would not approve the Agreement unless it contained an opt out provision to the binding arbitration provisions. Saturn brought this action against the Commissioner alleging that the statutes, as applied by the Commissioner to its Dealership Agreement, are preempted by the Federal Arbitration Act. The Virginia Automobile Dealers Association (VADA) intervened as a defendant.
 
 
 4
 The district court ruled that the provisions are not preempted by the Federal Arbitration Act (FAA), 9 U.S.C. Secs. 1 et seq., and granted summary judgment to defendants. Saturn Distrib. Corp. v. Williams, 717 F.Supp. 1147 (E.D.Va.1989). On appeal, the Center for Public Resources, Inc. submitted an amicus curiae brief supporting Saturn.
 
 
 5
 We hold that Sec. 46.1-550.5:27 of the Motor Vehicle Dealer Licensing Act, as interpreted by the Commissioner, does conflict with the Federal Arbitration Act, and is preempted by the Supremacy Clause, U.S. Const., Art. VI. Therefore, the proposed arbitration provisions in Saturn's Agreement are enforceable in Virginia, and the Commissioner may not prohibit or discourage use of the nonnegotiable arbitration provision in contracts between Saturn and its Virginia dealers.
 
 II.
 
 6
 "The Supremacy Clause of Art. VI of the Constitution provides Congress with the power to pre-empt state law." Louisiana Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 368, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986). The Federal Arbitration Act was enacted to promote the enforceability of arbitration agreements and to make arbitration a more viable option to parties weary of the ever-increasing "costliness and delays of litigation." Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 220, 105 S.Ct. 1238, 1242, 84 L.Ed.2d 158 (1985) (quoting H.R.Rep. No. 96, 68th Cong., 1st Sess. 2 (1924)). The Supreme Court has repeatedly recognized the value of arbitration as a means of dispute resolution, most recently in Rodriguez de Quijas v. Shearson/American Express, Inc., --- U.S. ----, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989); Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987); and Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985).
 
 
 7
 The FAA (9 U.S.C. Sec. 2) preempts "conflicting state laws which restrict the validity or enforceability of arbitration agreements." Supak & Sons Mfg. Co. v. Pervel Indus. Inc., 593 F.2d 135, 137 (4th Cir.1979) (footnote omitted). State laws are subject to preemption not only if they directly contradict federal law, but also if they stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941); Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 298, 108 S.Ct. 1145, 1150, 99 L.Ed.2d 316 (1988). The FAA constitutes "a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). The language of the FAA requires that states place no greater restrictions upon arbitration provisions than they place upon other contractual terms. In relevant part, the FAA declares that:
 
 
 8
 A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.
 
 
 9
 9 U.S.C. Sec. 2. Therefore, with few limitations, if a state law singles out arbitration agreements and limits their enforceability it is preempted.[2]
 
 
 10
 The Commissioner argues that the scope of FAA preemption is limited to laws covering existing arbitration agreements, and does not extend to laws that prohibit or regulate the formation of arbitration agreements. We disagree. Although most cases have arisen in the context of existing arbitration agreements, that circumstance does not limit the scope of FAA preemption. Indeed, many courts have at least implicitly recognized a broader scope of FAA preemption. See, e.g., Medical Development Corp. v. Industrial Molding Corp., 479 F.2d 345, 348 (10th Cir.1973); Collins Radio Co. v. Ex-Cell-O Corp., 467 F.2d 995, 997-98 (8th Cir.1972).
 
 
 11
 It is clear that a state may not refuse to enforce and may not revoke an existing arbitration agreement on the ground that the contract did not comply with rules of contract formation applicable only to arbitration provisions. See Webb v. R. Rowland & Co., Inc., 800 F.2d 803, 806-07 (8th Cir.1986) (violation of statute requiring arbitration provisions to be accompanied by a notice in 10-point type that the contract contains a binding arbitration provision does not render an otherwise valid arbitration agreement unenforceable). It is likewise clear that in passing the FAA, "Congress intended to foreclose state legislative attempts to undercut the enforceability of arbitration agreements." Southland Corp. v. Keating, 465 U.S. 1, 16, 104 S.Ct. 852, 861, 79 L.Ed.2d 1 (1984) (emphasis added). To restrict the FAA to existing agreements would be to allow states to "wholly eviscerate Congressional intent to place arbitration agreements 'upon the same footing as other contracts.' " Southland, 465 U.S. at 16-17 n. 11, 104 S.Ct. at 861 (quoting H.R.Rep. No. 96, 68th Cong., 1st Sess., 1 (1924)). The FAA does not allow a state legislature to circumvent Congressional intent by enacting special rules to discourage or prohibit the formation of agreements to arbitrate. As noted by the district court, "common sense dictates that a state should not be able to escape its enforcement duties under Sec. 2 by banning the formation of arbitration agreements." 717 F.Supp. at 1150.
 
 
 12
 We have not discovered a single authority which squarely addresses the issue and adopts the Commissioner's narrow interpretation of the scope of FAA preemption. The First Circuit recently rejected the Commissioner's interpretation in Securities Indus. Ass'n v. Connolly, 883 F.2d 1114, 1123-24 (1st Cir.1989). Our court previously alluded to this issue in Supak & Sons Mfg. Co. v. Pervel Indus. Inc., 593 F.2d 135 (4th Cir.1979), a case which involved a motion to stay proceedings pending arbitration pursuant to Sec. 3 of the FAA. In deciding whether the parties had agreed to arbitrate, we held that Uniform Commercial Code Sec. 2-207 applied to a written confirmation form containing an arbitration provision not agreed upon by the parties in a prior oral agreement. Thus Supak held only that the general rule of contract formation applied to contracts involving arbitration, and that the parties had not agreed to arbitrate the issue involved in that litigation. However, we recognized the possibility that: "Sec. 2 would preempt a state rule of contract formation which applied only to arbitration clauses and which placed an unreasonable burden on the parties' ability to commit themselves to arbitration." Id. at 137. We hold today that Sec. 2 does preempt state rules of contract formation which single out arbitration clauses and unreasonably burden the ability to form arbitration agreements. The district court was correct to hold that "arbitration agreements may not be burdened with 'conditions on (their) formation and execution ... which are not part of the generally applicable contract law.' " 717 F.Supp. at 1152 (quoting Securities Indus. Ass'n v. Connolly, 703 F.Supp. 146, 153 (D.Mass.1989)).
 
 III.
 
 13
 Having determined that the scope of the FAA encompasses laws affecting the formation of arbitration agreements, we turn now to the question of whether the FAA preempts the statutes at hand. The Virginia statute primarily at issue provides:
 
 
 14
 It is unlawful for any manufacturer, factory branch, distributor or distributor branch, or any field representative, officer, agent or any representative whatsoever of any of them:
 
 
 15
 * * * * * *
 
 
 16
 10. To fail to include in any franchise with a motor vehicle dealer the following language: "If any provision herein contravenes the valid laws or regulations of any state or other jurisdiction wherein this agreement is to be performed, or denies access to the procedures, forums, or remedies provided for by such laws or regulations, such provision shall be deemed to be modified to conform to such laws or regulations, and all other terms and provisions shall remain in full force and effect," or words to that effect.
 
 Va.Code Ann. Sec. 46.1-550.5:27.[3]
 
 17
 Although the statute appears to void all binding arbitration agreements in automobile franchise agreements, we accept as authoritative the Commissioner's interpretation of the statute as forbidding only nonnegotiable arbitration provisions and not negotiable arbitration agreements. Nevertheless, we hold that Sec. 46.1-550.5:27 is preempted to the extent that it places greater restrictions upon arbitration provisions than Virginia places upon other contractual terms. We find that the Commissioner's interpretation conflicts with the FAA because Virginia law generally permits contracting parties to make terms nonnegotiable, and singles out arbitration provisions as an exception to that rule.
 
 
 18
 The district court held that the statute "does not subject arbitration clauses to burdens not felt by other types of contracts" and indeed "affords privileged status to arbitration agreements," 717 F.Supp. at 1150, but we disagree. We find persuasive the reasoning of Securities Indus. Ass'n v. Connolly, 883 F.2d 1114 (1st Cir.1989), which held that Massachusetts regulations barring securities brokerage firms from including nonnegotiable arbitration provisions in their customer agreements were preempted by the FAA. The Massachusetts regulations (1) made it unlawful for securities brokerage firms to insist that prospective customers agree to arbitrate future disputes; (2) required brokerage firms to bring this prohibition to the attention of prospective customers who were offered arbitration as an option; and (3) required brokerage firms to explain the legal effect of any arbitration provision offered as an option. Thus, as the statute in this case, the Massachusetts regulations essentially prohibited nonnegotiable arbitration agreements.
 
 
 19
 The district court did not have before it the First Circuit's opinion, but distinguished the district court's opinion in Connolly, supra, 703 F.Supp. 146, in part because the defendants in that case admitted that the regulations in question singled out arbitration agreements. In the present case the state does not concede that the statute singles out arbitration agreements for especially burdensome treatment, but we find that the import of the statute renders it indistinguishable from the Connolly regulations.
 
 
 20
 The Commissioner contends that because the Virginia statute does not mention arbitration, and applies to any contractual provision that denies dealers access to the "procedures, forums or remedies" in Virginia, it does not single out arbitration agreements. He points out that the statute conceivably would void forum-selection provisions. However, the mere fact that a statute or regulation does not expressly refer to arbitration is not determinative on the question of whether it impermissibly singles out arbitration provisions. In Southland Corp. v. Keating, supra, the Supreme Court held that a California franchise statute which did not expressly refer to arbitration, but which voided any term that waived its protections, was preempted to the extent that it had the effect of prohibiting arbitration provisions. Nor is the fact that the Virginia statute voids other contractual provisions determinative, because the Supreme Court has emphasized that the focus should be on whether the statute, either on its face or as applied, imposes burdens on arbitration agreements that do not apply to contracts generally. See Southland, 465 U.S. at 16-17 n. 11, 104 S.Ct. at 861; Perry v. Thomas, 482 U.S. 483, 492-93, n. 9, 107 S.Ct. 2520, 2527, n. 9, 96 L.Ed.2d 426 (1987).
 
 
 21
 The district court erred in comparing the instant statute favorably to other provisions of the Motor Vehicle Dealer Licensing Act which absolutely bar the formation of certain terms between automobile manufacturers and dealers; e.g., a manufacturer may not sign a contract with a new dealership within a certain geographic proximity of an existing dealer without notice and a hearing, and it is unlawful for parties to contract in violation of that section. Sec. 46.1-550.5:27(4). From similar sections, the lower court reasoned that arbitration clauses are favored under the Motor Vehicle Dealer Licensing Act because only with respect to those provisions may the parties agree to "an otherwise impermissible term." 717 F.Supp. at 1151 (emphasis added). The lower court's analysis is flawed because it implies that a state may categorize arbitration agreements with other specific contractual terms which are void because they violate public policy--a hypothesis clearly contrary to the FAA.
 
 
 22
 Thus, the chief error in the district court's analysis is that it fails to use an appropriate comparison group. In determining whether the Virginia statute impermissibly burdens arbitration provisions, it must be compared to general contract law rather than to laws which apply only to contracts subject to the Motor Vehicle Licensing Act, or to miscellaneous statutes which prohibit a narrow assortment of unrelated contractual terms because they violate public policy.[4] The fact that the statute at issue might affect other terms in dealership agreements does not save it from preemption. As emphasized by the Supreme Court in Southland, 465 U.S. at 16-17 n. 11, 104 S.Ct. at 861 n. 11, only those grounds "that [exist] at law or in equity 'for the revocation of any contract' " are legitimate defenses to the enforceability of arbitration provisions. The essential difference between the regulations in Connolly and the U.C.C. provision at issue in Supak & Sons Mfg. Co. v. Pervel Indus. Inc., supra, is that the former are targeted at arbitration agreements whereas the latter is "a general rule of contract formation." Supak, 593 F.2d at 137.
 
 
 23
 Thus, in determining whether this statute forms an idiosyncratic rule specific to arbitration agreements or whether it is merely an unremarkable part of Virginia's general laws of contract formation, we must compare it with general common law and statutory law. The statute at issue, like the regulations in Connolly, impact arbitration agreements by forbidding their formation as nonnegotiable contractual terms. The statute is clearly intended to avoid potentially adhesive arbitration contracts between automobile manufacturers and dealers. If Virginia uniformly barred the formation of nonnegotiable contractual terms or declared all contracts of adhesion to be presumptively unenforceable, then the statute at issue would not be at odds with general contract law. See Connolly, 883 F.2d at 1120-21. However, as a general rule, Virginia does not bar parties from making certain provisions of their contracts nonnegotiable.[5] In fact, no other Virginia statute requires that a nonnegotiable provision in a standardized contract be made optional. In addition, Virginia does not always, or even usually, presume adhesive contracts to be unenforceable. Instead, Virginia adheres to the general rule that: "The use of a standard form contract between two parties of admittedly unequal bargaining power does not invalidate an otherwise valid contractual provision. To be invalid, the provision at issue must be unconscionable." Webb v. R. Rowland & Co., Inc., 800 F.2d at 807.
 
 
 24
 The FAA does not permit a state to single out arbitration agreements in standardized contracts and, in effect, declare their very formation to be unconscionable. Requiring arbitration provisions in dealership agreements to be optional rather than nonnegotiable unreasonably burdens the formation of arbitration agreements. If Saturn could not require that Virginia dealers agree to arbitration, it could be forced to contract with dealers who agree to all provisions except arbitration, despite the fact that arbitration is a core provision of Saturn's Dealership Agreement.[6] The Federal Arbitration Act does not allow such singular hostility to the formation of arbitration agreements. Because it has no general contract law restricting nonnegotiable provisions in standardized contracts, Virginia may not bar automobile manufacturers from making arbitration provisions a nonnegotiable term of doing business.
 
 
 25
 Thus, we hold that the statute is preempted because, as in Southland, it treats arbitration agreements more harshly than other contracts by disallowing their formation as mandatory provisions. "[C]ourts must be on guard for artifices in which the ancient suspicion of arbitration might reappear." Connolly, 883 F.2d at 1119. Since the Virginia statute resembles the regulations in Connolly more than the general rule of contract formation in Supak, we hold that it is preempted to the extent that it affects arbitration agreements.
 
 IV.
 
 26
 Our holding today reflects our disagreement with the notion adopted by the district court that the Virginia statute may be harmonized with the FAA because it only ensures "consensual rather than forced arbitration." Both the district court and the Commissioner cite portions of testimony taken at the legislative hearings on the FAA, which suggest that some advocates of the bill did not anticipate that it would be applied to certain standardized contracts. That these early remarks should not be over-emphasized is evident both from the absence of limiting language in the FAA and from the fact that the Act has often been applied to standardized contracts. See, e.g., Rodriguez de Quijas, 109 S.Ct. at 1918 (standardized contract between securities broker and its customers); Mitsubishi, 473 U.S. at 617, 105 S.Ct. at 3349 (standardized franchise agreement between automobile manufacturer and dealers); Perry v. Thomas, 482 U.S. at 485, 107 S.Ct. at 2529 (standardized contract between securities broker and its employees). Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989), is not to the contrary. In Volt, 109 S.Ct. at 1255, the Supreme Court stated that "[a]rbitration under the Act is a matter of consent, not coercion;" however, the Court did not intimate that standardized provisions are excluded from the FAA. Rather, the Court's language reflects its focus on the issue in that case--that parties are entitled to incorporate state law restrictions into their arbitration agreement that would otherwise be preempted by the FAA. The Court's statement that arbitration under the FAA is a matter of consent stresses only that the Act does not impose terms of arbitration but instead leaves them to the agreement of the parties.
 
 
 27
 The Commissioner contends that the Virginia statute merely prevents coercive agreements, and cites the disparity of bargaining power between manufacturers and dealers. Saturn counters that any disparity in bargaining power is less than most dealer/manufacturer agreements, since Saturn is new and seeks well-established dealers. Regardless of which version is closer to the truth, the FAA simply does not permit a state to legislate policy concerns in such a way as to thwart Congress' intent to place arbitration agreements on equal footing with other contracts. The argument that the Virginia statute is a necessary part of the state's scheme to protect dealers must therefore fail. Similar arguments have been rejected by the Supreme Court in Southland, supra (preempting statute designed to provide special protection for franchisees), and in Perry v. Thomas, supra (preempting statute designed to protect employees who might sign away in advance their rights to a judicial forum).
 
 
 28
 It is not this court's function to resolve the question of whether a particular arbitration agreement has been induced by an overwhelming disparity in economic power. However, we note in passing that the mere fact that Saturn requires dealers to agree to its arbitration provisions in order to obtain a Saturn dealership does not make its Dealership Agreement non-consensual. If a dealer does not wish to agree to nonnegotiable arbitration provisions, the dealer need not do business with Saturn. The Commissioner's fears that Saturn's arbitration provisions will be used to force dealers to waive the protections given to them by Virginia law are premature. Existing Virginia law can and should be applied to revoke any contract which results from fraud or the sort of overwhelming economic power which can render an agreement unconscionable. See Rodriguez de Quijas, 109 S.Ct. at 1921.
 
 V.
 
 29
 For the reasons set forth herein, we reverse the district court's grant of summary judgment to the Commissioner, and we grant summary judgment to Saturn. The challenged provision of the Virginia Motor Vehicle Dealer Licensing Act is preempted by the Federal Arbitration Act to the extent that it interferes with the nonnegotiable arbitration provision contained in Part One, Article 5 of the Automobile Dealership Agreement of plaintiff. Neither the Commissioner nor his agents shall take any act to prevent or discourage the use and/or enforcement of the contractual terms in contracts between Saturn Distribution Corporation and its dealers in the Commonwealth of Virginia requiring the exclusive use of binding arbitration for the determination of dealer contract disputes.
 
 REVERSED
 WIDENER, Circuit Judge, dissenting:
 
 30
 In my opinion, the majority abandons the proper and appropriate preemption analysis and fails to take account of Virginia's inherent right to protect her own citizens. Therefore, I respectfully dissent.
 
 
 31
 The various circumstances under which a federal statute may, by virtue of the supremacy clause, preempt state law are well settled: "when Congress ... expresses a clear intent to preempt state law, when there is outright or actual conflict between federal and state law, where compliance with both federal and state law is in effect physically impossible, where there is implicit in federal law a barrier to state regulation, where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress." Louisiana Public Service Comm'n v. FCC, 476 U.S. 355, 368-69, 106 S.Ct. 1890, 1898-99, 90 L.Ed.2d 369 (1986) (citations omitted). It is at once apparent that the preemption varieties just mentioned are not equals, although the preemptive effect is the same if a category applies, but a sliding scale in which a finding of preemption becomes more difficult as the tension between state and federal enactments becomes more obscure.
 
 
 32
 The category of preemption the majority employs here, the "frustrate the federal policy" theory, 476 U.S. at 369, 106 S.Ct. at 1899, rests at the bottom of this scale because "preemption under a frustration of federal purpose theory is more an exercise of policy choices by a court than strict statutory construction. An independent judgment that federal purposes require preemption comes in the face of congressional silence, both express and implied, on the subject." Abbot v. American Cyanamid Co., 844 F.2d 1108, 1113 (4th Cir.), cert. denied, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988). In the face of Congressional silence, "there is a presumption against preemption." Abbot, 844 F.2d at 1112. Moreover, because statutes that regulate the relationship between dealers and manufacturers in an attempt to equalize the parties' respective bargaining power are a legitimate exercise of a state's police powers, Boatland, Inc. v. Brunswick Corp., 558 F.2d 818, 823 (6th Cir.1977), " 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " California v. ARC America Corp., --- U.S. ----, ----, 109 S.Ct. 1661, 1663, 104 L.Ed.2d 86 (1989) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)).
 
 
 33
 Therefore, the appropriate starting point in examining the statute in question is not a "liberal federal policy favoring arbitration agreements," as the majority would have it. Every federal statute presumably was enacted to further a strong or liberal federal policy in favor of or against something, but that does not lead inexorably to preemption of every state law that touches on the same subject matter. See Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983) (upholding state moratorium on construction of new nuclear power plants despite federal policy promoting nuclear power); Commonwealth Edison Co. v. Montana, 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981) (upholding state's coal severance tax despite federal policy favoring production and use of coal); see also L. Tribe, American Constitutional Law Sec. 6-26, at 488 (1988) ("state laws that merely push against the grain of 'general expressions of national policy' in federal statutes will not, for that reason alone, be deemed to be preempted"). Instead, the proper analytical starting point is the presumption, double strength in this case to be sure, against preemption absent a clear and manifest Congressional intent to the contrary.
 
 
 34
 Applying the preceding principles to the Virginia statute is neither difficult nor lengthy, and requires a different decision than the majority obtains. First, "[t]he FAA contains no express pre-emptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration." Volt Information Sciences, Inc. v. Board of Trustees, 489 U.S. 468, ----, 109 S.Ct. 1248, 1251, 103 L.Ed.2d 488 (1989). To support a finding of preemption, therefore, the Virginia statute must in some way directly conflict with the FAA.
 
 
 35
 Because the FAA "[b]y its terms, does not apply until the arbitration clause in question is determined to be part of the contract," Supak & Sons Mfg. Co. v. Pervel Indus., 593 F.2d 135, 137 (4th Cir.1979), virtually every reported case in which a court has determined that the FAA preempts state law has dealt with the enforceability of otherwise valid arbitration agreements. The Virginia statute in issue deals not with the enforceability of arbitration agreements, however, but with their formation. As interpreted by the Commissioner, the statute only precludes Saturn from unilaterally imposing agreements to arbitrate upon its dealers. If a dealer agrees to arbitrate, the Virginia statute is no impediment to the agreement's enforceability. Because there is no direct conflict between the state statute and the FAA, this should end the inquiry under a proper preemption analysis. Because I believe the majority also errs by failing to recognize the significance of the Dealer's Day in Court Act (DDCA), 15 U.S.C. Secs. 1221-1225, however, I will address that issue.
 
 
 36
 The majority recognizes that "[a]n exception to federal preemption exists if Congress has overridden the FAA by indicating its intent to preclude waiver of the judicial forum for a particular statutory right." Op. at 722, n. 2. Although refusing to decide whether DDCA claims may be arbitrated, the majority notes that "the DDCA does not evince clear Congressional intent to override the FAA...." I disagree.
 
 
 37
 A Congressional intent to preclude waiver of a judicial forum for a particular statutory right "will be deducible from text or legislative history." Mitsubishi Motors v. Soler Chrysler-Plymouth, 473 U.S. 614, 628, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985). The legislative history of the DDCA, written some thirty years after the FAA was enacted in 1925, could not be more clear: "The bill creates a cause of action where none previously existed in that, irrespective of contractual provisions, it grants a right of review in the Federal courts of disputes between automobile manufacturers and their dealers...." H.R.Rep. No. 2850, 84th Cong., 2d Sess., reprinted in 3 U.S.Code Cong. & Ad.News 4596, 4596 (1956) (italics added); see Blenke Brothers Co. v. Ford Motor Co., 217 F.Supp. 459, 463-64 (N.D.Ind.1963) (dealer may pursue DDCA claim despite failing to comply with contractual provision requiring notice to defendant's Dealer Policy Board).
 
 
 38
 Perhaps mindful of the DDCA's legislative history, the majority declines to decide "whether all DDCA claims may be arbitrated." Instead, the majority invalidates the Virginia statute because it "also preclude[s] some waivers of a judicial forum for the enforcement of non-DDCA claims." In my view, this both mischaracterizes the Virginia statute and understates the significance of the DDCA's legislative history.
 
 
 39
 First, as noted earlier, the Virginia statute not only does not preclude waiver of a judicial forum for non-DDCA claims, it does not preclude waiver of a judicial forum for any claim. The statute merely ensures that, if a waiver occurs, the waiver is a voluntary choice on the part of the dealer and is not extracted by the manufacturer as part of a nonnegotiable contract of adhesion.
 
 
 40
 Second, the DDCA in terms supplies an automobile dealer with an action for the failure of an automobile manufacturer "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise." 15 U.S.C. Sec. 1222. This broad private action, which could extend to disputes over every aspect of the franchise relationship, was enacted for much the same reasons as the Virginia statute:
 
 
 41
 Concentration of economic power in the automobile manufacturing industry of the United States has developed to the point where legislation is required to remedy the manifest disparity in the ability of franchised dealers of automotive vehicles to bargain with their manufacturers.... The bill as amended proceeds from the conclusion that in the automobile industry concentration of economic power has increased to the degree that traditional contractual concepts are no longer adequate to protect the automobile dealers under their franchises.
 
 
 42
 H.R.Rep. No. 2850, 3 U.S.Code Cong. & Ad. News at 4596-97 (1956). Moreover, the DDCA explicitly does not preempt state law on the subject unless there is an express and direct conflict between state and federal statutes. 15 U.S.C. Sec. 1225.
 
 
 43
 Because Congress has expressed a clear intent to preclude a contractual requirement of waiver of a judicial forum for DDCA claims, the fact that the DDCA might not encompass every conceivable claim between manufacturer and dealer is of no consequence. I believe the DDCA is directly relevant not only to whether an exception to preemption exists, but, especially under a "frustrate the federal policy" theory, to whether preemption should apply in the first instance. Thus, the paramount question is revealed as not whether the DDCA immunizes a presumptively suspect state statute, but whether Congress has expressed a clear intent to preempt a presumptively valid state statute. Not only does the FAA fail to manifest such intent, but the DDCA, enacted thirty years after the FAA to advance exactly the same interests as the Virginia statute, appears to go even further than does the state statute. I believe that, if the most that can be said, as here, is that a presumptively valid state statute is in general tension with a federal statute of general application, and yet furthers precisely the same goals as another federal statute dealing with the specific subject in issue, the state enactment should stand until Congress says otherwise.
 
 
 44
 At bottom, the majority opinion rests on the one case in which a court determined that a state rule prohibiting unilateral imposition of arbitration agreements was preempted by the FAA, Securities Indus. Ass'n v. Connolly, 883 F.2d 1114 (1st Cir.1989). Even if we assume the FAA may preempt state rules of contract formation (an assumption with which it is at once apparent I do not agree),[1] Connolly is unpersuasive for at least two reasons.
 
 
 45
 First, the underlying reasoning of Connolly is its concern with "[i]ncreased resort to the courts, and the consequent tumefaction of already-swollen court calendars," 883 F.2d at 1116, a consideration I think is impermissible in view of Article III's command that Congress establish our jurisdiction. As well, Connolly relegates Massachusetts' regulation of arbitration agreements for "the public weal" as "self-congratulatory casuistry [that] will not wash." 883 F.2d at 1120. Such reliance, I suggest, only reveals the weakness of the position.
 
 
 46
 More to the point, Connolly is a securities case, and securities regulation is one area in which the Supreme Court has addressed the effect of the FAA. See Rodriguez de Quijas v. Shearson/American Express, Inc., --- U.S. ----, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989); Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987). Thus, although I disagree with the Connolly court's analysis, it is at least understandable that, in light of Supreme Court precedent, that court found that "nothing in the Securities Act, the Exchange Act, or the grant of concurrent power to the states to regulate securities manifests a congressional intent to limit or prohibit waiver of a judicial forum ... or to abridge the sweep of the FAA." Connolly, 883 F.2d at 1121. Even on that basis, however, the result the majority obtains here is not warranted. By contrast, the Virginia statute arises not from a grant of concurrent power, but from the State's inherent police power, and Congress in the DDCA did manifest an intent to preclude waiver of a judicial forum for claims between automobile dealers and manufacturers.
 
 
 47
 Virginia has determined, as did Congress, that a manifest disparity in bargaining power exists between automobile dealers and their manufacturers. By precluding Saturn from making arbitration clauses nonnegotiable, Virginia is merely seeking to ensure that arbitration "is a matter of consent, not coercion...."[2] Volt Information Sciences, Inc. v. Board of Trustees, 489 U.S. 468, ----, 109 S.Ct. 1248, 1251, 103 L.Ed.2d 488 (1989). Although Congress may have enacted the FAA to "revers[e] centuries of judicial hostility to arbitration agreements," Scherk v. Alberto-Culver Co., 417 U.S. 506, 510, 94 S.Ct. 2449, 2452, 41 L.Ed.2d 270 (1974) (footnote omitted), I cannot believe that our federalism will tolerate replacing judicial hostility with judicial advocacy. We sit, after all, to do justice between man and man and citizen and sovereign, not to keep our dockets clear.
 
 
 
 [1]
 If a dispute arises, either Saturn or a dealer may file a request for mediation. The dispute is forwarded to a panel, which recommends a consensus solution. If either party rejects that solution, or if both waive mediation, they proceed to binding arbitration, which provides for document discovery and a hearing. The Arbitration Panel, composed of two dealers and two Saturn representatives, is required to reach a consensus decision, which is final and unappealable, except as provided by the Federal Arbitration Act
 Since arbitration is central to the structure of its Dealership Agreement, Saturn refuses to contract with any dealer who will not agree to this mandatory arbitration clause. For this reason, this opinion refers to the arbitration clause as "nonnegotiable."
 
 
 [2]
 An exception to federal pre-emption exists if Congress has overridden the FAA by indicating its intent to preclude waiver of the judicial forum for a particular statutory right. State law in agreement with that Congressional mandate would not contravene the FAA. See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. at 627-28, 105 S.Ct. at 3355; Shearson/American Express, Inc. v. McMahon, 482 U.S. at 226-27, 107 S.Ct. at 2337-38. Likewise, a state law will not be preempted if it addresses that which the FAA does not. See Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 109 S.Ct. 1248, 1254-55, 103 L.Ed.2d 488 (1989)
 The Commissioner has argued that Congress has expressed an intent to override the FAA's application to arbitration agreements between automobile manufacturers and dealers in the Dealer's Day in Court Act (DDCA), 15 U.S.C. Secs. 1221-1225. We have recently stated that:
 Courts cannot determine whether arbitration agreements are to be enforced by making subjective judgments as to the relative importance of various federal statutes. Rather, Congress must provide clear guidance if it wishes federal courts to refrain from enforcing arbitration agreements when violations of a particular statutory right are alleged.
 Gilmer v. Interstate/Johnson Lane Corp., 895 F.2d 195, 203 (4th Cir.1990). Although we note that the text of the DDCA does not evince clear Congressional intent to override the FAA, we do not decide today whether all DDCA claims may be arbitrated. Even if the DDCA does preclude waiver of a judicial forum for the enforcement of its rights, the Virginia statutes do not mirror that restriction but also preclude some waivers of a judicial forum for the enforcement of non-DDCA claims. The question of whether Congress intended all DDCA claims to be arbitrable may be resolved if and when a dispute under the DDCA arises.
 
 
 [3]
 Although the complaint also contests the validity of Sec. 46.1-550.5:24, that provision merely requires the Commission's approval of franchise or sales agreements to prevent the formation of agreements containing terms inconsistent with the Motor Vehicle Dealer Licensing Act. Since Sec. 46.1-550.5:24 is essentially an enforcement provision which does not independently pertain to arbitration agreements, it does not conflict with the FAA and is not preempted
 
 
 [4]
 Ironically, the district court faulted Connolly for what it perceived as a similar error, because it believed that the district court in Connolly erroneously compared the Massachusetts regulations only to the body of state common law, unenhanced by statutory law. See Connolly, 703 F.Supp. at 153. We read the First Circuit opinion as including in the comparative body of law both general principles of common law and of statutory law
 
 
 [5]
 The district court noted that certain provisions of the Insurance Code, the Beer Franchise Act, the Retail Franchising Act, the Petroleum Products Franchise Act, and other miscellaneous provisions of the Virginia Code, like the Motor Vehicle Dealer Licensing Act, also flatly prohibit certain terms without opportunity for negotiation. However, specialized provisions applicable only to certain types of contracts do not form a cohesive general law or pattern of laws applicable to most contracts
 
 
 [6]
 It is important to keep in mind that no automobile dealer is required to contract with the plaintiff. This is a new company, a new product, and a new concept of marketing. Dealers are not required to execute the new agreement in order to continue as dealers under existing conditions. It is only dealers wishing to sell the Saturn automobile who are required to agree to arbitration
 
 
 [1]
 The Eleventh Circuit has adhered to the FAA's distinction between contract formation and contract enforcement even though the state rule of formation singled out arbitration clauses for somewhat less favorable treatment. See Eassa Properties v. Shearson Lehman Brothers, 851 F.2d 1301, 1304 n. 7 (11th Cir.1988) (upholding provision of Uniform Partnership Act which provided that all partners must agree to submit claim or liability to arbitration). I advocate, of course, that we should agree with Eassa rather than with Connolly
 
 
 [2]
 I take cold comfort in the majority's "important" recognition of the fact that "no automobile dealer is required to contract with [Saturn]." Op. at 726, n. 6. No one is required in the legal sense to execute any contract of adhesion, or by definition a contract would not exist, yet that does not prevent courts and legislatures from designating certain contracts as adhesive. Moreover, it is equally true that General Motors is not required to sell Saturn automobiles in Virginia, as the Court indicated was the case with Audis or Volkswagens in World Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 287, 100 S.Ct. 559, 562, 62 L.Ed.2d 490 (1980)